## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Keisha B.,

           Plaintiff,

v.

Andrew Saul, Commissioner of Social
Security,

           Defendant.

Case No. 20-cv-1794 (DSD/HB)

**REPORT AND RECOMMENDATION**

---

HILDY BOWBEER, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Keisha B. seeks judicial review of a final

decision by the Commissioner of Social Security denying her application for

supplemental security income.  This matter is before the Court on the parties' cross-

motions for summary judgment [ECF Nos. 25, 27], which were referred to the

undersigned for the issuance of a report and recommendation pursuant to 28 U.S.C. §

636(b)(1)(B) and District of Minnesota Local Rule 72.1.  For the reasons set forth below,

the Court recommends that the Commissioner's decision be reversed and the matter be

remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C.

§ 405(g) for further proceedings.

## I.      BACKGROUND

### A.      Procedural Background

      Plaintiff applied for supplemental security income (SSI) benefits on January 18,

2017, asserting disability because of a learning disability, depression, borderline

personality disorder, and mental illness.  (R. 78.)[1]  Plaintiff's application was denied

initially on April 3, 2017, and on reconsideration on June 20, 2017.  (R. 76, 93.)  She

requested a hearing before an Administrative Law Judge (ALJ), which occurred on July

2, 2019.  (R. 43.)  The ALJ issued a written decision on July 16, 2019, finding that

Plaintiff's impairments did not prevent her from working.  (R. 12, 21, 34.).  Plaintiff

requested review by the Appeals Council, which it denied on June 19, 2020.  (R. 1.)  She

filed this action on August 17, 2020.  (Compl. [ECF No. 1].)

**B.    Relevant Medical Records**

The Court will recount the administrative record only to the extent it is helpful for

context or necessary for resolution of the specific issues presented in the parties' motions.

The Court focuses on evidence relevant to plaintiff's alleged mental impairments.

Plaintiff was born in March 1976, and was 43 years old at the time of the ALJ's

decision.  (R. 9, 241).  She alleges her disability began on January 18, 2017.  (R. 12).

Plaintiff submitted a function report to the SSA[2] stating that she become easily

upset, anxious, and frustrated with others when under stress or experiencing changes in

routine.  (R. 304–305, 308–311.)  These feelings kept her awake, brought about panic

---

[1]  The Court cites to the Social Security Administrative Record as "R." and uses the page numbers added by the Social Security Administration in the lower right corner of each page.

[2]  The index to the Administrative Record identifies this as a function report submitted in February 2014, but the handwritten date appears to the Court to be more consistent with a "7" rather than a "4" and 2017 would be more consistent with the date of her application and alleged onset date.  The ALJ discussed the report in her determination but did not ascribe a particular date to it.  The Court assumes for purposes of its analysis that the report was submitted in February 2017.

attacks, made her easily depressed, made it difficult to get along with others, and caused her to lose two jobs.  (R. 304–305, 308–310.)  She also reported great difficulty focusing or finishing what she started and only being able to follow written instructions for 20 minutes before becoming frustrated, but faring better with spoken instructions.  (R. 304, 308.)  She needed reminders for scheduled activities and relied on support workers to attend appointments with her and help her manage anxiety and maintain focus.  (R. 309.)  But she did not have any difficulties with personal care, could take medication without reminders, could daily prepare meals including mixed vegetables, chicken, eggs, and frozen foods, complete her daily chores without outside encouragement (though it took longer due to her conditions), do daily hobbies, and use public transit or walk to buy groceries and personal needs.  (R. 305–309.)

Plaintiff saw Bryan Delvin, MS, LP for IQ testing and assessment of mental health in 2016.  (R. 409, 412.)  She reported rapid mood swings, difficulty focusing and paying attention, racing thoughts, memory lapses, and anxiety and threat perceptions around people.  (R. 412.)  Delvin diagnosed her with borderline intellectual functioning based on her IQ score of 68 (2nd percentile) in Full Scale IQ on a WAIS-IV assessment, which placed her in the extremely low range of intellectual functioning.  (R. 409–410, 412.)  Delvin assessed Plaintiff as mildly intellectually disabled, and predicted based on her scores that she would struggle "significantly" with comprehension, learn at a substantially slowed pace, and show difficulties in memory functioning.  (R. 411.)  Delvin also reported that she showed relevant thoughts, organized, coherent thought processes, and intact memory.  (R. 411.)

Plaintiff engaged a therapist, Kelly Rokus, LPC, in January 2017.  (R. 423, 460.)

Plaintiff often showed anger, frustration, depression, and anxiety related to her sons'

placement in the foster system.  (R. 423, 426, 722.)  After several sessions, Plaintiff

acknowledged to Rokus that therapy and consistent medication helped manage her mood.

(R. 652.)  Throughout 2017, Rokus generally reported that Plaintiff showed benign

mental status criteria except for her judgment and insight, which were regularly

diminished, poor, impulsive, or blaming of others, and her mood, which was regularly

irritable or angry and/or depressed.  (*Compare,* R. 424, 427, 430, 462, 469, 613, 653, 723,

*with*, R. 459, 466, 604, 632.)  Plaintiff stopped seeing Rokus prior to February 2018,

though the record does not say why.  (R. 788.)

Plaintiff later engaged Rebecca Vigars, LMFT, in January 2019 for therapy.  (R.

981-982.)  Vigars noted she was attentive and cooperative, in a good mood, with a full

and reactive affect, rational thoughts with logical and goal-directed processes, good

insight, judgment, and reliability.  (R. 984-985.)  Plaintiff failed to follow through and

missed two appointments as of the most recent records.  (R. 1065.)

Plaintiff sought a prescription for Depakote[3] from Lynette Lamp, MD, in March

2017, to manage her mood swings, depression, and anxiety.  (R. 439.)  She reported some

anxiety and depression and becoming angry easily.  (R. 439.)  Lamp reported her speech

was loud but consistent with other times she had seen Plaintiff, Plaintiff answered

---

[3] Depakote is the brand name for divalproex sodium, used to treat seizure disorders,
migraines, and the manic phase of bipolar disorder.  DEPAKOTE,
https://www.drugwatch.com/depakote/ (last visited January 10, 2022)

questions well and not tangentially, and was a good historian of her medication history. (R. 439–440.)  In late March 2017, Plaintiff reported to Lamp that her mood was more stable and better on the medication, though she still felt anxious.  (R. 441.)  Lamp noted that she seemed calmer.  (R. 441.)

Plaintiff also saw James Roth, MD, for a psychiatric consultation in April 2017. (R. 443.)  She told Roth that the Depakote only helped for several hours a day, and she continued to struggle with daily high anxiety, depression, irritability, poor concentration and memory, and episodes of panic.  (R. 443.)  In his mental status exam, Roth registered Plaintiff's irritability, scattered thoughts, fair attention and concentration, and limited cognition and memory.  (R. 445.)

Plaintiff started seeing Elizabeth Schossow, APRN, for psychiatric services in May 2017.  (R. 453.)  Plaintiff reported that the Depakote made her mood good and stable and reduced her paranoia, but it did not help with her anxiety and by the evening it wore off and she became angry.  (R. 453.)  In the mental status exam, Schossow noted that Plaintiff had loud but not pressured speech, normal thought processes, fair memory, attention, and concentration, intact knowledge, and anxious affect and mood.  (R. 455.) Schossow recommended that Plaintiff continue with adult rehabilitative mental health services (ARMHS) and therapy and get a county mental health case manager, as they were medically necessary to improve Plaintiff's ability to cope with her mental illness, manage her medications, and avoid hospitalization.  (R. 455.)

Plaintiff saw Schossow on a continuing basis throughout 2017 but struggled to consistently attend appointments.  (R. 634, 674, 692.)  She regularly reported daily

disrupted sleep, racing thoughts, anger outbursts, depression, high anxiety and fear, trouble concentrating, irritability, and some paranoia.  (R. 634-635, 661, 674.)  She repeatedly reported struggling to track and keep her appointments and work schedule and her sons' appointments.  (R. 674, 692.)  Plaintiff at one point stopped her medication because she did not know how to get refills.  (R. 707.)

Schossow increased Plaintiff's Depakote dosage over time to improve mood management, helped her brainstorm ways to track and manage her appointments and work schedule, explained how to get a refill from her pharmacy, and planned to set up home delivery of the medication to avoid Plaintiff forgetting how to get refills.  (R. 635, 661, 707.)  The mental status exams from this period note that Plaintiff showed fair to poor judgment, insight, memory, attention, and concentration, normal language, intact knowledge, and anxious or frustrated affect with irritable or hypomanic mood.  (R. 634, 674.)  Schossow noted in a later visit that Plaintiff's irritation appeared situational rather than constant.  (R. 661.)  Plaintiff eventually stopped seeing Schossow due to problems with transportation to the appointments.

Plaintiff thereafter engaged Rachel Beukema, APRN, for medication management in March 2018, seeking to restart her Depakote.  (R. 488.)  Plaintiff described her symptoms as irritation and agitation, mood swings, recurring intrusive unwanted thoughts, obsessions and compulsions, excessive anger, low motivation, panic attacks, poor attention, and trouble sleeping.  (R. 488, 502.)  She reported that she had difficulty focusing, organizing, planning, and understanding and communicating with others.  (R. 489.)

In the initial appointment, she reviewed Plaintiff's medical records and talked with her about being fired from past jobs and her recent homelessness, concluding that Plaintiff's symptoms affected her ability to work, find gainful employment, and have her own living space. (R. 488–489.) Beukema also noted that Plaintiff was challenged by her job at Taco Bell and became irritated and angry easily, and that she appeared isolative and lacking social skills. (R. 497.) She noted in her next appointment that Plaintiff's mental impairments were very evident when speaking with her, as she spoke loudly, simply, and in short sentences. (R. 502.)

In March 2018, Plaintiff told Beukema that she lost her parental rights to her sons because she failed to comply with her own and her sons' medical care appointments, hygiene, and school recommendations. (R. 502-503.) In November 2018, Beukema reported that Plaintiff took two weeks off work to help her cope with stress of the job, her SSI appeal, and her sons' adoption, but still felt like she "couldn't hold it together" and might lose her job and apartment. (R. 508-509.) In December 2018, Plaintiff accused Beukema of taking her sons away from her, which Beukema had to repeatedly correct throughout the appointment until Plaintiff seemed to understand. (R. 993–994.) Plaintiff's ARMHS worker requested a letter from Beukema limiting Plaintiff to 20 hours of work per week due to her stress and struggles with the job, which Beukema wrote. (R. 993-994.) Beukema noted that Plaintiff was in significant distress, and learned through questioning that Plaintiff was overwhelmed if asked to do more than one task, and became very anxious if she worked even five minutes past her shift. (R. 993.) Beukema

7

also prescribed Seroquel[4].  (R. 995.)

Beukema's mental status exams from 2018 and January 2019 noted that Plaintiff was routinely moderately distractible and impulsive, mildly inattentive, had an anxious and serious mood with blunt and flat affect, showed adequate judgment and insight, and employed suppression and repression, passive aggression, minimization, and apathetic withdrawal as emotional defenses.  (R. 489, 494, 499, 505–506, 990, 997–998.)  In February and April 2019, Beukema noted Plaintiff had an anxious, fearful, suspicious, tense, and hostile mood, immature judgment and limited insight.  (R. 1004, 1012.)

In January 2019, Beukema (along with Plaintiff's ARMHS worker and case manager) began supporting a conservatorship for Plaintiff.  (R. 1000.)  Beukema also provided a medical source statement for SSA.  (R. 972.)  She identified Plaintiff's symptoms as including poor memory, sleep and mood disturbance, panic attacks, difficulty concentrating, distractibility, blunt affect, poor impulse control, difficulty making independent decisions, irritability, and social withdrawal.  (R. 972.)  She further identified Plaintiff as sensitive to stress and emphasized that she was easily overwhelmed by basic life activities, and struggled to focus for more than two hours, cope with change, and handle routine work stresses.  (R. 973.)  She did not suspect Plaintiff exaggerated her symptoms and did not believe that treatment would improve Plaintiff's ability to concentrate or avoid being overwhelmed.  (R. 973.)  She expected that Plaintiff would be

---

[4] Seroquel is the brand name for quetiapine fumarate, and is used to treat major depression, bipolar disorder, and schizophrenia.  SEROQUEL, https://www.rxlist.com/seroquel-drug.htm (last visited January 10, 2022).

absent from work more than three times a month due to her symptoms, and could only accomplish 2–3 work tasks.  (R. 973, 976.)

Plaintiff sought cognitive testing in April and May 2019 from psychologist Raymond List, Ph.D.  (R. 1023.)  Plaintiff reported being distracted, overwhelmed, and confused easily, having trouble staying on task and feeling scattered, and having poor short-term memory and memory for details.  (R. 1023–1024.)  She also reported chronically being nervous, tense, irritable, easily discouraged, and depressed.  (R. 1024.)  She reported independently handling her medications, finances, shopping, meal preparation, and transportation, but her caseworker indicated that Plaintiff needed guidance on finances.  (R. 1024.)  She reported working 16-20 hours a week at Taco Bell, but that the job caused her stress as she struggled to keep up the speed and demands of the job and struggled to understand her job tasks.  (R. 1025.)  List noted that her mental status included sparse but goal-oriented and coherent speech, no abnormal though content, fair concentration and attention, and good judgment and insight.  (R. 1025.)

List administered a Repeatable Battery of Neuropsychological Status Form A, which showed Plaintiff in the 13th percentile for immediate recall, 2nd percentile for delayed recall, 3rd percentile for language, 1st percentile for visuospatial/construct, 42nd percentile for attention, and a total score in the 2nd percentile.  (R. 1025.)  He reported that she showed slow cognition, very slow learning rate, and quite limited ability to structure new information, though cues helped.  (R. 1026.)  As a result of these limitations, she did learn less than her peers in the same amount of time and was limited in her retrieval, and likely had a mild intellectual disability.  (R. 1026.)

He saw her again in May 2019, during which she reported her mood and anxiety had improved with her current medication. (R. 1028.) List's mental status exam noted that she had fluent and coherent speech, good eye contact, unremarkable mood and affect, no abnormal thoughts, fair concentration and attention, and good judgment and insight. (R. 1028.) A technician administered WAIS-IV, WRAT-4, and Texas Functional Living Scale tests and reported that Plaintiff was motivated and understood simple and complex test instructions on initial presentation. (R. 1028–29.) On the WAIS-IV, Plaintiff scored 66 (1st percentile) for verbal comprehension, 73 (4th percentile) for perceptual reasoning, 74 (4th percentile) for working memory, 74 (4th percentile) for processing speed, and a full-scale IQ score of 66 (1st percentile). (R. 1029.) List opined that although Plaintiff could engage in basic problem solving with a specific goal, she had significantly impaired cognition and severely limited intellectual capacity for comprehension. (R. 1029.) On the WRAT-4, Plaintiff scored in the 10th percentile for word reading, 13th percentile for spelling, and 1st percentile for math, from which List opined she would struggle with any math more complex than adding or subtracting, and may not actually understand the meaning of words that she could read. (R. 1030.) However, she could read signage in the community. (R. 1030.) The Texas test suggested she functioned in the 10th percentile for functional living skills, creating difficulty for her handling multistep instructions and complex money-based transactions. (R. 1030.) List found that Plaintiff has a relative strength for memory, being able to retain information relevant to her once she learned it. (R. 1030.)

List considered these results consistent with Delvin's testing in 2016, and

understood them to show Plaintiff was chronically severely limited in comprehension and intellectual capability for learning, prone to anxiety when overwhelmed, needing structure and community supports, and permanently disabled.  (R. 1030.)

### C. Evidence from Plaintiff's ARHMS Worker, Case Manager, and Employer

Throughout the disability period Plaintiff also had a case manager, Erica Oliver, BSW, and an ARHMS worker, initially Anjelica Molitor and then Stephanie Rybold.  (R. 420, 971, 1085.)

In a diagnostic assessment in November 2016 by case worker Amanda Falkers, Plaintiff demonstrated variable judgment, poor insight, anxious mood, confused and disorganized thoughts, poor short and long-term memory, flights of ideas, poor redirectability, and restlessness.  (R. 413–414.)  Plaintiff reported depressed mood, becoming irritated and frustrated when struggling to understand something or when people avoided her, anxiety in social settings and especially when interacting with child protective services (CPS) about her children's placement in a foster home, struggling with focus and concentration, mood swings, and difficulty sleeping due to constant worrying.  (R. 415.)  Falkers noted that Plaintiff met the criteria for a Major Depressive Disorder and Anxiety Disorder.  (R. 418.)  Falkers suggested that Plaintiff would benefit from psychiatric care, medication education and management, case management services, ARMHS, and assistance with understanding and completing paperwork for financial and housing support, making decisions about health care and independent living, and setting up transportation.  (R. 415–416.)

In her initial ARMHS assessment in March 2017, Plaintiff reported needing help to manage or reduce her disinterest in all daily activities, fatigue, loss of energy, hopelessness, and diminished ability to concentrate, which interfered with her ability to keep appointments, complete activities of daily living, and complete tasks in a timely manner.  (R. 471.)  She reported her sons were removed from her home because her mental health symptoms interfered with her ability to consistently care for their basic needs.  (R. 479.)  She also reported in work and social settings becoming easily depressed, overwhelmed, frustrated, struggling to concentrate and understand information, and follow a work schedule.  (R. 479-480.)  Her depression often led her to isolate for days at a time, neglect basic needs like eating and sleeping, and fail to keep appointments and engage support providers.  (R. 480.)  And she struggled to pay rent and bills, often felt overwhelmed and frustrated by the paperwork for financial assistance programs, was unable to complete it without support, and due to anxiety and depression, put off tasks to keep or obtain financial assistance until the last minute.  (R. 473, 481.)

But the assessment noted several strengths.  Plaintiff generally identified her mental health symptoms and how they impacted her activities of daily living.  (R. 473, 479-480.)  She was motivated to seek out support programs and mental health services to manage her symptoms and regain custody of her sons, plus access financial assistance programs.  (R. 473, 481.)  She kept good physical and dental healthcare.  (R. 480-481.)  She cleaned and maintained her apartment independently.  (R. 481.)  She also independently organized medical transportation and public transit.  (R. 481, 557.)

Throughout 2017, these providers generally reported that Plaintiff showed benign

mental status criteria except for her judgment and insight, which were often diminished and periodically blaming of others, and her mood, which was regularly irritable or angry and/or depressed. (*Compare,* R. 532, 535, 593–594, 597–598, 607, 616, 619, 629, 639, 643, 656, 669, 672, 678, 681, 684, 743, 747–748, 754–755, *with*, R. 541, 558, 561, 567, 575, 579, 585–586, 613, 647, 650, 666, 690, 696, 699, 702, 738.)  Plaintiff's mental status criteria were benign more often in 2018 than in 2017, though she regularly showed degraded judgment, insight, mood, and behavior starting in October 2018. (*Compare*, R. 785, 798, 828, 844, 868, 872, 889, 893, 905, 908, *with*, R. 764, 774, 778, 793, 807, 811, 815, 819, 823, 836, 840, 848, 856, 860, 875, 881, 883, 886, 896, 902.)  By 2019, however, her mental status was more variable.  She showed reduced grooming, diminished to poor insight, and poor and impulsive judgment, blamed others for her problems, and became rigid, hostile, paranoid, and uncooperative during appointments. (R. 1069–1070, 1079, 1084.)  Only twice did she have benign exams.  (R. 1074, 1088.)

These workers helped Plaintiff in a variety of fields.  They routinely provided education, coaching, support, and prompting for Plaintiff to fill out paperwork and attend interviews like her SSI proceedings and assistance programs to cover rent, food, utilities, and health insurance.  (*See, e.g.*, R. 534, 537, 540, 557, 560, 566, 574, 578, 582, 589, 597, 618, 642, 655, 665, 683, 686, 698, 714, 743, 751, 754, 771, 778, 814, 818, 827, 831, 839, 901, 904.)  They further helped her manage her time and keep appointments through reminders, writing down schedules, and prompting her to communicate with transporters and providers.  (R. 668, 680, 683, 733, 737, 847, 855, 859, 871, 880, 886.)  They also communicated and advocated on Plaintiff's behalf with services and providers.  (R. 851,

898.)  They provided coaching, modeling, and prompting to aid Plaintiff's

communication and problem-solving skills with her landlord, boss, coworkers, and

family.  (R. 585, 593, 606, 615, 638, 649, 689, 698, 737, 743, 793, 814, 889, 907.)

Rybold routinely helped her create budgets for shopping and rent.  (R. 806, 818, 822,

871, 1078, 1083.)

Despite this continuous assistance, Plaintiff struggled to consistently meet her

daily needs.  She consistently reported hopelessness, loss of concentration, confusion,

paranoia, depressed mood, anxiety, irritability, sleep disturbance, and racing thoughts to

these service providers.  (R. 788, 862–864, 1060.)  Her anxiety and depressed mood at

times caused her to neglect basic needs and fail necessary tasks of independent living like

cooking and hygiene.  (R. 789, 862–864, 1060.)

She lost her electricity and phone due to unpaid bills in March 2017 and was

evicted for unpaid rent in August 2017.  (R. 540, 747, 790.)  She found new housing in

February 2018, but only after Oliver and Rybold helped Plaintiff file an extension for her

section 8 housing assistance and contacted her landlord for section 8 paperwork.  (R. 774,

782.)  She struggled to pay rent at the new location and was facing imminent eviction

with $5700 in back rent by April 2019.  (R. 806, 864, 867, 895, 1069.)  Plaintiff could not

comprehend the eviction threat, telling Rybold that her landlord would accept a little bit

of rent even though the landlord told her and Rybold that he would evict Plaintiff.  (R.

867, 1069.)  She became elevated and confused when Rybold attempted to reality-check

her and prompt her to contact her landlord.  (R. 1069.)  She was not able to discuss

moving to a board-and-lodge, and could not understand that she was denying the

situation.  (R. 1078.)

Plaintiff also did not have a bank account because she was not able to save money, nor a budget to monitor her spending, and she often paid bills late.  (R. 800, 1078.)  She spent her money impulsively and relied on her mother for financial support.  (R. 1062.)

She also began in 2018 and into 2019 to routinely miss or forget multiple appointments per month, fail to call to cancel them, and forget to schedule rides to them. (R. 788, 790, 793, 801, 843, 847, 862–864, 1060, 1062, 1065.)  In February 2019, Rybold noted that Plaintiff had no-showed on her new therapist twice, and had only one more chance to make a dental appointment or lose that service.  (R. 1060, 1062.)

Plaintiff's struggles with concentration and confusion caused her to not comprehend paperwork or submit it on time.  (R. 789–790, 862–864, 1060.)

She struggled in social and work settings to stay focused during a conversation and became irritated and shut down when she did not understand what others were saying to her.  (R. 788, 862–864, 1060–1061.)  She was unable to communicate assertively and appropriately, leading her to rely on her case manager and Beukema to write letters communicating her scheduling requests to her boss.  (R. 788, 862–864, 1060–1061.)

In August 2018, Rybold noted that Plaintiff's mental illness symptoms would increase unless she was prompted to follow through on recommendations from providers, but by February 2019, Rybold highlighted that Plaintiff became irritated easily when given recommendations that she did not like.  (R. 862–864, 1060.)  In a March 2019 functional assessment, Rybold recommended that Plaintiff receive medically monitored services in a residential home due to the problems discussed above, a three-level increase

from Plaintiff's then low intensity community services. (R. 1065.) By May 2019, Rybold concluded that Plaintiff required more support than she could provide and transferred her to another ARHMS worker. (R. 1083, 1089.)

Plaintiff also started working part-time at a Taco Bell on June 8, 2017. (R. 380.) Her manager reported in January 2019 that she was often late to work and frequently absent, despite working only 20 hours per week on her request, and was only 60% as productive as other employees in a similar position. (R. 392-393.) But her manager reported she satisfactorily completed the usual duties required of her position without special assistance and in the same time as other employees in a similar position. (*Id.*)

### D.    Evidence from State Agency Consultants

State agency consultants reviewed Plaintiff's application initially and upon reconsideration in 2017. (R. 78, 95.) For mental status, they noted her records reflected that she showed appropriate dress and good grooming, variable judgment and poor insight, anxious mood, restless and fidgety behavior, confused and disorganized thoughts, and had difficulty understanding questions and recalling dates and events. (R. 101.) They identified intellectual and depressive disorders. (R. 83, 99.) They considered Delvin's cognitive tests, a January 2017 medical statement from Rokus indicating Plaintiff would not be able to work in the foreseeable future, (R. 407), Plaintiff's function report, and records from Plaintiff's previous applications. (R. 100–102, 105). Upon reconsideration, they also had records from Rokus, Lamp, and Roth. (R. 82.) They opined that Plaintiff's allegations about the severity of her symptoms were only partially consistent with her reported activities of daily living and the objective medical evidence.

16

(R. 86, 103.)  They discounted Rokus's statement because it lacked objective evidence, and questioned the validity of Delvin's test results because Plaintiff had higher scores in previous cognitive testing, a prior example of symptom exaggeration, and performed activities like managing her finances, completing her forms, and reading.  (R. 84–85, 100–103, 105.)  They concluded she was at most moderately limited in her work-related functioning, and had the functional capacity to consistently accomplish routine, repetitive 3–4 step tasks, have brief and superficial interactions with others, and could handle relatively ordinary levels of supervision found in many work settings.  (R. 87–88, 104–105.)

### E.    Hearing Testimony

During the hearing, Plaintiff testified that she was then working 13–18 hours per week and had reduced her hours from a high point in June 2018 because the work was too fast, she had too many tasks in a short amount of time, and too many hours at a time that she could not handle due to stress and anxiety.  (R. 53–54.)  But she agreed she could do simple tasks not involving customers like washing dishes or garbage.  (R. 55.)  She explained she became anxious and irritated and could not focus or remember tasks for longer than 5–10 minutes.  (R. 56–57.)  Her medication helped her focus but she could not do multiple tasks in a row or handle multiple people talking, and would forgot what was said.  (R. 59–60.)  She had altercations at work because she became angry and overwhelmed when coworkers asked her to switch tasks.  (R. 61.)  On one occasion in June 2019 she became so overwhelmed and angry that she left work early.  (R. 61.)  She relied on a strict timetable and a board of specific tasks to manage her job.  (R. 61–62.)

She did not do any recordkeeping or paperwork.  (R. 66.)  At least once a month, she was absent from work due to depression, anger, and stress.  (R. 68.)  She acknowledged that her ARMHS worker and other providers believed she should be in a more restrictive living situation, but she did not think it was necessary because she could take her medication herself, and she had the ARMHS worker and case manager to handle her other needs.  (R. 69.)

The ALJ asked the vocational expert to assume someone with Plaintiff's education, age, and work experience, plus the ability to understand, remember, and carry out only simple, routine instructions, interact only occasionally with others, make only simple, work-related decisions, have only occasional changes in work setting, and have no production paced work.  (R. 71.)  The expert testified that the person could do work as a laundry aide, a bagger of clothing, or a stuffer.  (R. 72.)  The expert also testified that an employer would tolerate such an employee being absent only one day per month and being off task no more than 10% of the workday.  (R. 72.)

### F.     The ALJ's Decision

The ALJ followed the five-step sequential evaluation process for determining disability.  20 C.F.R. § 416.920(a)(4).  The five steps are: (1) whether the claimant's work activity, if any, is substantial gainful activity; (2) whether the claimant has any severe, medically determinable impairments meeting the duration requirement; (3) whether one or more of those impairments meets or medically equals the criteria of a listed impairment; (4) whether the claimant's residual functional capacity (RFC) allows her to do past relevant work; and (5) whether the claimant's RFC and age, education, and

work experience allow her to adjust to other available work.  *Id.* (a)(4)(i)–(v).  If an ALJ

determines at any step that the claimant is disabled or not disabled, they stop the

evaluation.  *Id.* (a)(4).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful

activity since January 18, 2017, the alleged onset date of her disability.  (R. 12, 14.)  At

step two, she determined that Plaintiff had severe, medically determinable impairments of

intellectual disorder, mood disorder, and anxiety disorder.  (R. 14–15.)  The ALJ

concluded at step three that none of Plaintiff's impairments met or equaled the severity of

any listed impairments.  (R. 15–21.)  The ALJ determined at step four that Plaintiff's

RFC prevented her from continuing to perform her past relevant work as a fast-food

worker.  (R. 33.)  Finally, the ALJ concluded at step five that Plaintiff had the RFC, age,

education, and work experience to successfully adjust to work positions such as but not

limited to laundry aide, clothing bagger, and stuffer.  (R. 34.)  Accordingly, the ALJ

concluded Plaintiff was not disabled.

## II.   DISCUSSION

Plaintiff contends the ALJ erred at step three in failing to find that her mental

impairments, singly or in combination, equaled one or more of the listed impairments

identified in Listings 12.04, 12.05, or 12.06.  Specifically, she argues that the ALJ erred

in her paragraph B analysis in finding that Plaintiff had only moderate, rather than

marked, limitations in her ability to understand, remember, or apply information, and in

her ability to concentrate, persist, or maintain pace.  She argues in the alternative that the

ALJ erred in concluding that her impairments did not meet the paragraph C criteria.  In

particular, Plaintiff argues that although the ALJ agreed that the supportive services Plaintiff was receiving diminished the signs and symptoms of her disorder, the ALJ's finding that Plaintiff did not meet the second paragraph C criterion—that she had achieved only marginal adjustment to the demands of independent living—was not supported by substantial evidence.  Finally, Plaintiff contends that the ALJ's RFC analysis following step three was deficient because it failed to include, or to explain why she was not including, Plaintiff's need for absences from work.  Had that limitation been included, Plaintiff argues, the ALJ would have found her disabled.

### A.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether the ALJ made a legal error and whether substantial evidence in the record as a whole supports the decision.  *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021); 42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted).  But "[s]ubstantial evidence in the record as a whole requires a more searching review than the substantial evidence standard." *Grindley*, 9 F.4th at 627; *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  A court must consider evidence that fairly detracts from the ALJ's decision. *Grindley*, 9 F.4th at 627.  But a court may not "reweigh" the evidence, or reverse the ALJ's decision "merely because substantial evidence would have supported an opposite decision." *Id.*  "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from

the evidence and one of those positions represents the ALJ's findings, the court must

affirm the ALJ's decision." *Id.*

On the other hand, a court will disturb the ALJ's decision if it finds from the

evidence as a whole that the decision "falls outside the available zone of choice." *Kraus*

*v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021). Furthermore, "[i]t is well-established that

an agency's action must be upheld, if at all, on the basis that was articulated by the

agency itself, and that it cannot be sustained on the basis of post-hoc rationalizations of

appellate counsel." *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 715 n.7 (8th

Cir. 1979); *Stacey S. v. Saul*, Case No. 18-CV-3358 (ADM/TNL), 2020 WL 2441430, at

*15 (D. Minn. Jan. 30, 2020), *report and recommendation adopted*, Case No. 18-CV-

3358 (ADM/TNL), 2020 WL 1271163 (D. Minn. Mar. 17, 2020).

A claimant seeking SSI has the burden to prove disability. *See Roth v. Shalala*, 45

F.3d 279, 282 (8th Cir. 1995).  The claimant is disabled if "he is unable to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months."  42 U.S.C.

§ 1382c(a)(3)(A).  The disability, not just the impairment, must last 12 months. *Titus v.*

*Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

### B.      Whether Substantial Evidence Supported the ALJ's Findings That Plaintiff Did Not Satisfy the Criteria for a Listed Impairment

Plaintiff first argues that the ALJ erred in finding at step three that her

impairments did not satisfy the criteria for one or more listed impairments.  (Pl.'s Mem.

at 18[5] [ECF No. 26].)  The Listing of Impairments identifies impairments that, if the

criteria are met, are deemed severe enough for a claimant to be presumptively disabled.

20 C.F.R. § 416.925(a).  An impairment meets the requirements of a listing when it

satisfies all the criteria and meets the duration requirement.  *Id.* § 416.925(c)(2)–(3).

Even if an impairment does not meet all the criteria, it can medically equal the criteria,

meaning it is at least equal in severity and duration to the criteria.  *Id.* § 416.925(c)(5);

§ 416.926(a).

The ALJ analyzed Plaintiff's impairments under 20 C.F.R. Part 404, subpart P,

Appendix 1, sections 12.04, .05, and .06, respectively, and found that her impairments

did not meet the criteria.  (R. 15.)  A mental disorder under Listings 12.04 and 12.06 must

satisfy paragraphs A and either B or C.  20 C.F.R. Pt. 404, subpt. P, App. 1,

§ 12.00(A)(2).  A mental disorder under Listing 12.05 must satisfy either paragraph A or

B.  *Id.* § 12.00(A)(3).  The ALJ found that Plaintiff did not satisfy paragraphs B or C for

Listings 12.04 and 12.06, or paragraphs A or B for Listing 12.05.  (R. 16, 19.)

### 1.    Paragraph B Criteria

Paragraph B examines whether a claimant is limited in four broad domains of

workplace functioning including the ability to (1) understand, remember, or apply

information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4)

adapt or manage oneself."  20 C.F.R. Pt. 404, subpt. P, App. 1, § 12.00(A)(2)(a)–(b).  The

ALJ considers factors like the quality and level of a claimant's overall functional

---

[5] In citing the parties' memoranda of law, the Court uses the parties' pagination rather
than that assigned by the ECF system.

performance, any episodic limitations, the amount of supervision or assistance a claimant requires, and the settings in which a claimant can function. *Id.* § 416.920a.

A claimant satisfies paragraph B if the evidence supports a marked limitation in two functional domains, or a severe limitation in one. *Id.* Pt. 404, subpt. P, App. 1 § 12.00(A)(2)(b). A claimant has a marked limitation when "[her] functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited," and a severe limitation when "[she is] not able to function in this area independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00(F)(2)(d)– (e). For the first, third, and fourth domains, "the greatest degree of limitation of any part of the area of mental functioning directs the rating of limitation of that whole area . . . [i.e.] you must be able to understand *and* remember *and* apply information . . . [and] concentrate *and* persist *and* maintain pace in order to complete the [work] task." *Id.* § 12.00(F)(3)(f). A marked limitation in any part means a marked limitation for the whole domain. *Id.*

For Listing 12.05, the paragraph B criteria require the same limitations in the same domains, plus a showing of IQ scores below 70. *Cf. Id.* § 12.05(B)(2); § 12.04(B); § 12.06(B).

The ALJ considered the paragraph B criteria for each section and found that Plaintiff had only moderate limitations in her ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. (R. 16–19, 21.) Plaintiff takes issue with her conclusions as to the first and third domains.

#### a.      Plaintiff's Ability to Understand, Remember, or Apply Information

Plaintiff contends the ALJ erred in concluding that she is only moderately limited in her ability to understand, remember, or apply information.  (Pl.'s Mem. at 21.)  This domain encompasses "the abilities to learn, recall, and use information to perform work activities."  20 C.F.R. Pt. 404, subpt. P, App. 1, § 12.00(E)(1).

> Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.

*Id.*

Plaintiff appears to challenge the ALJ's findings in this area on two grounds.  First, she asserts that the results of the IQ tests conducted by List and Devlin, together with the opinions of both providers, establish a marked limitation in this domain, but that although the ALJ summarized that evidence, she failed to explain the weight given (or not given) to those test results and opinions.  (Pl.'s Mem. at 21–22.)  "The ALJ should explain the weight given to such opinions to ensure that the discussion of the evidence allows a subsequent reviewer (such as this Court) to follow the ALJ's reasoning."  (*Id.* at 22–23 (citing 20 C.F.R. § 416.927(f)(2); *Andrews v. Astrue,* 917 F. Supp. 2d 624, 638 (N.D. Tex. 2013)).

List and Devlin's tests and conclusions, taken alone and at face value, would support a finding of marked limitation in Plaintiff's ability to understand, remember, or

apply information.  (*See* R. 409–412, 1026, 1029–1030.)  But contrary to Plaintiff's

contention, the ALJ explicitly considered additional evidence and also described her

reasons for discounting List's and Devlin's opinions.  The ALJ considered Plaintiff's

mental status exams from health care providers and social support providers, finding

them generally benign or mildly impaired with regards to cognition and understanding

throughout the relevant time.  (R. 16–17, 31.)  The ALJ also cited Plaintiff's  function

report and Plaintiff's reports to providers of her good functioning and activities of daily

living, including using public transit and handling her own finances, shopping, meals, and

medications, using Facebook, playing games on her phone for relaxation, and

maintaining contact with her teenage daughter.  (R. 16–18.).  She further highlighted

notes from care providers indicating that Plaintiff "was able to answer questions well, and

was not tangential" and was described as a "good historian."  (R. 16.)

Plaintiff is correct that the ALJ described the results of the cognitive exams

administered by List and Devlin in her discussion of the paragraph B criteria without

specifically explaining in that section of the opinion how much weight she gave them.

(R. 16–17.)  But the ALJ described in the course of her RFC analysis why she discounted

both List's and Devlin's opinions in this area.  She stated that she discounted Devlin's

report because he saw Plaintiff only once, before the alleged onset of her disability, and

his opinion of her restrictions was inconsistent with her ability to maintain employment

in the self-reported fast-paced Taco Bell and her ability to manage her daily activities and

finances independently.  (R. 23, 25.)  The ALJ discounted Devlin's IQ testing results

because the state reviewing psychologists questioned the validity of those scores based on

previous tests suggesting Plaintiff had greater cognitive abilities as well as reasons to doubt Plaintiff's effort on Delvin's tests. (R. 30–31, 84–85, 101–102.) But the ALJ accounted for the testing results in the RFC "with restrictions on complexity of tasks, pace of work, stress level of work, and social interaction required." (R. 25.) The ALJ also contrasted Plaintiff's "full scale IQ score of 69" with her ability to complete her forms and handle her finances independently, go to the library, and read. (R. 31.)

Similarly, the ALJ explained in her RFC analysis why she discounted List's report, finding it was "not consistent with the lack of consistent mental status examination findings and quite good activities of daily living." (R. 31.) As with her consideration of Devlin's test results, the ALJ found List's results were inconsistent with Plaintiff's "work history . . . [,] her ability to complete her forms independently . . . [, and] her reports of handling all aspects of her finances independently, and that she enjoys going to the library and reading." (R. 31.)

But "an ALJ's failure to adequately explain [her] factual findings is not a sufficient reason for setting aside an administrative finding where the record supports the overall determination." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008) (quotation omitted). Furthermore, an ALJ's findings in an RFC analysis can cure an insufficient factual explanation in the analysis of the Listing of Impairments. *See Vance v. Berryhill*, 860 F.3d 1114, at 1117–18 (8th Cir. 2017). Here, the ALJ explained in her RFC analysis that she gave List's and Devlin's reports little weight, and why she did so, so Plaintiff's complaint that she did not specifically address it in her discussion of the listing is unavailing.

Plaintiff next argues that the ALJ improperly relied on evidence of Plaintiff's ability to perform activities of daily living in rejecting the results of List's and Devlin's assessments, contending that these activities do not relate to her ability to understand, remember, or apply information in a work setting.  (Pl.'s Mem. at 24.)

A claimant's ability to perform activities of daily living may be relevant evidence for determining a disability.  *See Barnett v. Barnhart*, 362 F.3d 1020, 1023 (8th Cir. 2004); *Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005) ("An ALJ may reject IQ scores that are inconsistent with a claimant's daily activities and behavior, especially when the scores are based on a one-time examination by a nontreating psychologist."); *cf. Harris v. Barnhart,* 356 F.3d 926, 930 (8th Cir. 2004) (the ALJ may weigh part time work as evidence against disability).  *See also* 20 C.F.R. § 416.927(b) (SSA considers all relevant medical and non-medical evidence when determining disability).  The kinds of activities of daily living the ALJ considered here, including playing phone games, reading, handling finances, using public transit, filling out paperwork, shopping, and cooking, involve some amount of ability to learn and recall information, understand it, and apply it to accomplish tasks.  (R. 16–18.)  Such evidence can be relevant to the ALJ's assessment of a claimant's impairment in this domain.

Plaintiff asserts, however, that the ALJ considered this evidence while ignoring evidence that Plaintiff is not able to perform these activities consistently and that her performance has deteriorated over time.  Relatedly she argues the ALJ failed to consider whether Plaintiff's self-report of her activities overstated her actual accomplishments.  (Pl.'s Mem. at 24.)  As a general matter, "a person's ability to engage in personal

activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity," *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).  This is particularly true for mental disorders, which have symptoms that fluctuate over time.  *Follett v. Astrue*, Case No. 09-cv-3167 (MJD/SRN), 2010 WL 4979011, at *10 (D. Minn. Nov. 16, 2010), *report and recommendation adopted*, Case No. 09-cv-3167 (MJD/SRN), 2010 WL 4974554 (D. Minn. Dec. 2, 2010).  "[T]here is no necessary inconsistency in a record that discloses both (1) diagnoses of depression [and] anxiety . . . , and (2) a claimant's ability to engage in certain tasks or even to enjoy certain activities."  *Id.*

Consequently, instead of simply citing daily activities as evidence of good functioning, an ALJ should analyze the evidence of a claimant's ability to complete daily activities independently, appropriately, effectively, and on a sustained basis.  *See* 20 C.F.R. § 416.920a(c)(2); Part 404, subpt. P, App. 1, § 12.00(C)(3), (5)–(6), (D)(1)–(3), (F)(3).  *Reed v. Barnhart*, 399 F.3d 917, 922 (8th Cir. 2005).  "With regard to mental disorders, the Commissioner's decision must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes."  *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001).  *See Follett*, 2010 WL 4979011, at *10 (highlighting several conflicts between claimant's self-reported good daily activities and reports from others that claimant could not accomplish those tasks).  And when an ALJ fails to resolve evidentiary conflicts about activities of daily living that impact the resolution of the case, the court should remand the case.  *Moraine v. Soc. Sec. Admin.*, 695 F. Supp. 2d 925, 960–63 (D. Minn. 2010) (remanding when the ALJ cited

claimant's activities of daily living to discredit her testimony about her disabling symptoms without resolving conflicting evidence that she could not complete those activities without significant support). *See Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) ("inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand").

The Court concludes that in this case, the ALJ failed to resolve evidentiary conflicts about Plaintiff's ability to accomplish activities of daily living that could impact the finding as to her ability to understand, remember, or apply information in a work setting. For example, the ALJ repeatedly cited Plaintiff's function report and self-reports to her providers that she independently handled her finances, completed her paperwork, managed her medication and medical care, maintained housing, completed chores, used public transportation, did her own shopping and meal preparation, and enjoyed the library, reading, Facebook, and phone games. (R. 16–17, 19, 22, 24, 29–31, 33.) The ALJ considered these self-reports evidence that Plaintiff had good ability to perform activities of daily living, and she specifically relied on them when deciding to discount List's report and in support of her finding that Plaintiff had only a moderate limitation when supporting the moderate limitation. (R. 16–17, 19, 24, 31, 33.) But other evidence from the disability period, namely Plaintiff's case management and ARMHS reports (which make up a substantial portion of the record) and parts of Plaintiff's own testimony, directly conflicts with that evidence. Plaintiff's testimony and functional assessments by care providers confirm that because of her depression, anxiety, stress, and anger, she isolated for days at least once a month and failed to take care of personal needs

like food and hygiene, communicate with others, and attend work and appointments.  (R. 68–69, 471, 480, 711, 789, 862–863, 1061.)

Further, case worker and ARMHS reports show that Plaintiff faced multiple evictions and loss of utilities due to unpaid bills, did not have a bank account or budget because she could not save money and spent money impulsively, and repeatedly relied on Rybold to help her budget because her lack of concentration and confusion prevented her from consistently making or staying within a budget.  (R. 473, 481, 540, 747, 790, 800, 806, 818, 822, 862–864, 867, 871, 895, 1062, 1069, 1078, 1083).  In late 2018 and early 2019, Plaintiff failed to understand the reality of being evicted for failing to pay rent despite racking up $5700 in unpaid rent.  (R. 867, 1069.)

Plaintiff also missed multiple appointments every month, often forgot to track them or schedule rides without prompting from providers, and was regularly late to or missed work.  (R. 68, 392, 597, 789, 790, 793, 801, 843, 847, 862–864, 1060, 1062, 1065.)  She testified to missing work at least once a month when she became so angry and frustrated that she could not be around people, and relying on her ARMHS worker, case manager, and therapist to help her.  (R. 68–69.)  Rybold regularly prompted and guided Plaintiff through scheduling rides and tracking appointments, but by 2019 Plaintiff was cancelling or no-showing most appointments with her providers.  (R. 668, 680, 683, 733, 737, 847, 855, 859, 871, 880, 886, 1065.)

Finally, Plaintiff struggled to understand and correctly complete paperwork due to stress, anxiety, and cognitive difficulties, and relied extensively on Rybold and others for prompting, education, guidance, and coaching to understand, fill out, and submit

paperwork correctly and timely, and sometimes her providers made inquiries and submissions for her.  (*See, e.g.*, R. 64–65, 534, 537, 540, 557, 560, 566, 574, 578, 582, 589, 597, 618, 642, 655, 665, 683, 686, 698, 714, 743, 751, 754, 771, 774, 778, 782, 788, 789–790, 814, 818, 827, 831, 839, 851, 898, 901, 904.)  Plaintiff's documented struggles and reliance on support providers to accomplish these tasks directly conflicts with her self-reported ability to accomplish these tasks independently, effectively, and on a sustained basis.

Although the ALJ had an obligation to consider this evidence, *see Hutsell*, 259 F.3d at 711, she made only passing mention of Plaintiff's ARMHS and case management services in her decision, and even those limited mentions focused primarily on the mental status assessments by those providers.  When analyzing Plaintiff's ability to understand, remember, and apply information, she stated, "case management notes typically reflected benign mental status examination findings in terms of cognition," citing a subset of the mental status exams by Rybold and Rokus from May 2017 to May 2019.  (R. 17.)  When analyzing Plaintiff's ability to interact with others, she cited a November 2016 functional assessment by Falkers that reported that Plaintiff's family members were her primary social support.  (R. 18.)  She also found some evidence of Plaintiff's irritability, citing select mental status exams by Rybold showing Plaintiff as irritable.  (R. 18.)  When analyzing Plaintiff's ability to adapt and manage, she noted that Plaintiff "receives case management services and has had some difficulty with homelessness as well as losing custody of her children."  (R. 19.)  When analyzing Plaintiff's residual functional capacity, she again cited that subset of benign mental status exams by Rybold and Rokus,

and recounted Plaintiff's job search mid-2017 as recorded by Rybold.  (R. 28–29.)  She

highlighted a February 2019 functional assessment in which Rybold raised concerns

about Plaintiff's alcohol consumption, and a mental status exam from April 2019

showing poor insight and judgment.  (R. 29.)  She again cited the benign mental status

findings when discounting List's opinion, (R. 31), Plaintiff's account of the impacts of

her symptoms, (R. 31), case manager Oliver's January 2019 statement, (R. 32),

Beukema's assessment of Plaintiff's limits, (R. 32), and Rokus's January 2017

assessment, (R. 33.)  She made no other mention of these services or cited those records.

Considering the record as a whole, the Court cannot conclude that the ALJ

considered and resolved the conflicting evidence regarding Plaintiff's daily activities.

This, in turn, calls into question the ALJ's rationale for discounting at least List's opinion

and her conclusion that Plaintiff had only a moderate rather than a marked limitation in

this domain.  (*See* R. 16–18, 31.)  It is not for the Court to determine at this juncture

whether the ALJ should have come to a different determination about the severity of

Plaintiff's limitation in this domain, as the ALJ bears the duty to resolve that conflict in

the first instance.  *Moraine*, 695 F. Supp. 2d at 962–63.  But neither can the Court

hypothesize a rationale in support of the ALJ's determination.  *Stacey S.*, 2020 WL

2441430, at *15 ("It is not the role of this Court to speculate on the reasons that might

have supported the ALJ's decision or supply a reasoned basis for that decision that the

ALJ never gave." (*citing Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016)).

because the ALJ failed to resolve this evidentiary conflict with potential to change the

finding, the Court cannot conclude that the ALJ's finding was supported by substantial

evidence.  *Id.*

But this error alone is not sufficient to warrant remand unless the Court also finds the ALJ similarly erred in her analysis of the severity of Plaintiff's limitation in her ability to concentrate, persist, or maintain pace.[6]  Accordingly, the Court turns next to that issue.

### b.    Plaintiff's Ability to Concentrate, Persist, or Maintain Pace

Plaintiff next argues that the evidence requires a finding that she has a marked limitation in her ability to concentrate, persist, or maintain pace, and that the ALJ's finding that she only suffers from a moderate limitation in this domain is not supported by substantial evidence.  (Pl.'s Mem. at 25.)  This domain encompasses "the abilities to focus attention on work activities and stay on task at a sustained rate."  20 C.F.R. Part 404, subpt. P, App. 1, § 12.00(E)(3).

> Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

*Id.*

Specifically, Plaintiff argues the ALJ erred because she failed to discuss evidence

---

[6] Plaintiff does not argue that the evidence, even if the conflicts were resolved in her favor on remand, would support a finding of a severe limitation in this domain which would alone be sufficient to find she met or equaled one of the listed impairments.

bearing on the severity of Plaintiff's limitation in her ability to maintain pace and to

persist. (Pl.'s Mem. at 25–26.) Plaintiff first cites Delvin's and List's results showing

that she learns at a significantly slower rate compared to peers. (*Id.* at 26.) But these

records are not relevant to Plaintiff's ability to maintain pace because they focus on

Plaintiff's ability to learn and understand information, not her ability, after learning a

task, to complete it with an appropriate, consistent pace and in a timely manner without

distractions.

However, Plaintiff also argues that the ALJ did not address evidence that bore on

Plaintiff's ability to persist, including that Plaintiff was inconsistent in completing

activities of daily living, attending work, and meeting with support providers when

stressed, anxious, and depressed. Plaintiff also notes here, as in the discussion of the

previous domain, that the ALJ gave only passing mention to the ARMHS and case

management reports about Plaintiff's activities anywhere in her decision. (Pl.'s Mem. at

26–27.)

An ALJ's failure to discuss specific evidence is not a cause for remand provided

substantial evidence in the record supports the finding and the court sees no other errors

that warrant remand. *See Scott*, 529 F.3d at 822; *Draper*, 425 F.3d at 1130. In discussing

the severity of Plaintiff's limitation in this domain, the ALJ acknowledged Plaintiff's

self-reported struggles with concentrating and losing focus, remembering things,

completing tasks, and following instructions. (R. 18.) But she also cited the largely

benign mental status exams from Delvin, Roth, Schossow, Vigars, Beukema, and List

regarding Plaintiff's attention, concentration, impulse control, knowledge, and

cooperation, as well as Plaintiff's report to Beukema that she relaxed by playing phone games and using Facebook.  (R. 18–19.)

The Court concludes that the same failure of the ALJ to consider and resolve conflicts in the evidence that bore on her analysis of the prior domain also requires remand for reconsideration of her findings in this domain.  *See Draper*, 425 F.3d at 1130 (an ALJ's incomplete analysis of the evidence can be a basis for remand if it could have affected the outcome of the determination).  The records from Plaintiff's case management and ARMHS are relevant to this domain, as they describe greater difficulty persisting and maintaining an ordinary routine and work schedule than Plaintiff's rosy self-reports, and greater than the ALJ found.  As explained for the prior domain, the ALJ should account for this evidence in assessing Plaintiff's functioning, including resolving the conflict with Plaintiff's aelf-reported activities.

Accordingly, the Court recommends that Plaintiff's motion be granted and the matter remanded for further consideration by the ALJ of whether Plaintiff meets the paragraph B criteria for Listings 12.04 or 12.06 due to marked limitations in the areas of ability to understand, remember and apply information, and concentrate, persist, and maintain pace.

### 2.  Paragraph C Criteria

Plaintiff argues in the alternative that she satisfies the paragraph C criteria for Listings 12.04 and 12.06.  (Pl.'s Mem. at 28.)  A claimant is disabled if she satisfies the criteria of paragraphs A and C of Listings 12.04 or 12.06.  20 C.F.R. Part 404, subpt. P, App. 1, § 12.00(A)(2).  Paragraph C provides criteria for a serious and persistent mental

disorder lasting at least two years. *Id.* § 12.00(A)(2)(c). The evidence must show that a claimant "rel[ies], on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of [her] mental disorder." *Id.* § 12.00(G)(2)(b). The evidence must also show that despite this ongoing support, the claimant achieved only marginal adjustment, meaning "[her] adaptation to the requirements of daily life is fragile [and she has only] minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." *Id.* § 12.00(G)(2)(c).

> We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

*Id.*

The ALJ, considering the paragraph C criteria for sections 12.04 and 12.06, found that although Plaintiff had treatment, therapy, and supports that diminished the symptoms of her mental disorders, the evidence did not establish that she had achieved only marginal adjustment. (R. at 20.) She emphasized the "claimant's ability to live independently, manage her own medical care, and advocate for herself . . . [which were changes in daily life] correlated with stability in symptoms." (*Id.*)

Plaintiff argues that she experiences only marginal adjustment to the demands of independent living despite her many and prolonged supports.  (Pl.'s Mem. at 35.) Plaintiff cites numerous records, primarily from Rybold and Beukema, detailing how despite her support services, (1) she faced multiple evictions and loss of utilities, (2) loss of housing and medical assistance, (3) failed to consistently take her medication and understand the correct dosage, (4) failed to make and keep appointments with providers, (5) lost her parental rights to her sons due to inability to consistently care for them, (6) had to limit her work to twenty hours or less per week and took two weeks off due to stress and anxiety, and (7) by May 2019 required a higher-intensity ARMHS worker to assist with her needs.  (Pl.'s Mem. at 36–38.)  The record also shows that Plaintiff relied on her support providers for coaching, prompting, education, and modeling for all types of paperwork and for advocating her interests with her care providers, family, boss, coworkers, landlord, and roommate.  She was routinely absent from work and failed to care for her personal needs due to her stress, anxiety, depression, and anger.

Evidence also suggests stressors in Plaintiff's life caused a decline in function and deterioration in her symptoms beginning in late 2018.  Beukema reported in November 2018 that Plaintiff was facing multiple stressors from her work, her sons' placement in foster system and her inability to see them, her SSI appeal, her upcoming neurocognitive testing, and her fears of losing her job and apartment because she could not "hold it together."  (R. 509.)  In December 2018, Plaintiff had an episode where she believed that Beukema took her sons and could not understand Beukema's role as a medication manager.  (R. 993.)  That is also when Rybold asked Beukema for a letter limiting

Plaintiff to 20 hours of work per week due to Plaintiff's stress. (R. 993.) Plaintiff reported that she could only handle one task at a time, became overwhelmed when asked to multitask, and became very anxious working even five minutes past the scheduled end of her shift. (R. 993.) She also reported racing thoughts, stress, anxiety, feeling overwhelmed, and lack of sleep due to anxiety over her sons, landlord, boss, coworkers, SSI, and her job. (R. 993-994.) By January 2019, Beukema, Rybold, and Plaintiff's case manager were all supporting a conservatorship for Plaintiff should she receive SSI. (R. 1000.) Plaintiff owed $5700 in back rent but could not comprehend her risk of eviction or discuss finding new housing. (R. 867, 1069.) Plaintiff's mental status exams from this period were degraded and disrupted much more consistently compared to 2017 and 2018, and in March 2019 Rybold noted that her appearance and hygiene fell below usual standards on a frequent basis. (R. 1064, 1069–1070, 1074, 1079, 1084.) In June 2019, Plaintiff left work early after becoming overwhelmed and angry with coworkers asking her to do multiple tasks. (R. 61.) This evidence all suggests degradation in Plaintiff's symptoms and functioning as stressors arose in her life, but the ALJ failed to resolve conflicts between it and Plaintiff's self-reports of her good daily functioning.

Defendant responds that Plaintiff's arguments merely ask the Court to reweigh the evidence, and the ALJ's finding is supported by substantial evidence of Plaintiff's ability to handle her activities of daily living, health care, finances, transportation, and work without deteriorated symptoms. (Def.'s Mem. at 19–22.) The ALJ does not identify in this part of her determination the particular evidence she relies on to support her statement that Plaintiff had the "ability to live independently, manage her own medical

care, and advocate for herself." (R. 20.) But to the extent it is premised, as Defendant

contends, on Plaintiff's activities of daily living, health care, finances, transportation, and

work, the evidentiary conflict discussed above with regard to the paragraph B analysis

applies here. And to the extent the ALJ took other evidence into account, the Court has

no basis to discern what that other evidence may have been. In short, for the same

reasons described *supra,* the Court cannot conclude that the ALJ's decision was

supported by substantial evidence when the ALJ failed to resolve evidentiary conflicts

over Plaintiff's ability to accomplish these tasks independently, effectively, and

consistently. While the ALJ is not required to discuss every piece of evidence submitted,

*Wildman v. Astrue*, 596 F.3d 959 (8th Cir. 2010), the Court's uncertainty about the

evidentiary basis for the ALJ's finding and the potential conflicts in the evidence cause

the Court to recommend remand for reconsideration and clarification. *See Willcockson v.*

*Astrue*, 540 F.3d 878, 879-880 (8th Cir. 2008).

### C.    Whether the ALJ Erred in Omitting a Limitation Relating to Plaintiff's Absenteeism from Plaintiff's Residual Functional Capacity

Lastly, Plaintiff challenges the ALJ's analysis of her Residual Functional Capacity

(RFC). (Pl.'s Mem. at 38.) In between the third and fourth steps, the ALJ must

determine the claimant's RFC. 20 C.F.R. § 416.945(a)(5)(1). RFC measures the most a

claimant can still do in a work setting, despite limitations caused by her impairments. 40

C.F.R. § 416.945(a)(1). The ALJ must base the RFC "on all relevant evidence, including

medical records, observations of treating physicians and others, and the claimant's own

descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th

Cir. 2004).  To have "residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  *Reed*, 399 F.3d at 923.  The claimant must have the ability to find and hold a job in a work environment.  *Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir. 1984).

Based on Plaintiff's testimony, the ALJ determined that her impairments could reasonably be expected to cause her alleged symptoms, but found that her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (R. 22.) The ALJ reviewed her work history, the assessment by her employer, various mental health assessments and opinions, and the opinions of the state agency mental health consultants.  (R. 21–33.)  She restricted Plaintiff's RFC based on her mental health symptoms and impairments consistent with the evidence, and found that Plaintiff had the RFC to work at any exertion level in an unskilled job involving occasional interactions with others; low-stress, simple decisions; limited changes in work setting; and no production paced work.  (R. 21, 23.)

Plaintiff argues that the ALJ, without explanation, excluded from Plaintiff's RFC that she would be frequently absent from work.  In that regard, Plaintiff relies particularly upon Beukema's opinion that her impairments would cause her to be absent three or more days a month, as well as evidence of record that Plaintiff frequently missed both work and appointments.  (Pl.'s Mem. at 38–40.)  She contends that, had the ALJ included this limitation in the RFC, she would have been found disabled because the vocational expert

testified an employer would not tolerate an employee being absent more than once a month.  (*Id.* at 39.)  Defendant responds that the ALJ properly weighed evidence supporting these absences, and that Plaintiff failed to show her absenteeism was caused by her impairments.  (Def.'s Mem. at 23–24.)

If excessive absenteeism is caused by a claimant's impairment, it should be included in the RFC and considered by the vocational expert.  *Baker v. Apfel*, 159 F.3d 1140, 1146 (8th Cir. 1998); *see also Youness v. Berryhill*, Case No. 17-cv-4108 (DSD/BRT), 2018 WL 2716301, at *10 (D. Minn. May 18, 2018) (finding an RFC unreliable when it did not include limitations associated with more than usual off-task time or absenteeism); *Gude v. Berryhill*, Case No. 2:16-CV-79-SPM, 2018 WL 1470455, at *5 (E.D. Mo. Mar. 26, 2018) ("Because the ALJ failed to make it clear that she considered Dr. Waheed's opinion regarding absenteeism and failed to give good reasons for discounting that opinion, and because the decision not to include Dr. Waheed's opinion on work absences in the RFC potentially affected the outcome of the case, remand for further consideration is required.").

In the RFC assessment, the ALJ acknowledged Beukema's check-the-box medical source statement as indicating, *inter alia,* that Plaintiff's symptoms would cause her to have poor or no ability to maintain regular attendance and be punctual.  (R. 32.) Although the ALJ did not specifically discuss Beukema's opinion about Plaintiff's likely absenteeism, she gave Beukema's statement little weight overall, finding it "significantly overly restrictive" in view of the benign mental status exams and Plaintiff's ongoing work and activities of daily living.  The ALJ also discounted Beukema's opinions

because she "[did] not provide an objective assessment in support of her significantly

restrictive limitations, and so she apparently relied quite heavily on the subjective report

of symptoms and limitations provided by the claimant," the reliability of which the ALJ

questioned.  (R. 32–33.)  The ALJ also acknowledged the work questionnaire submitted

by Plaintiff's fast food employer, which noted Plaintiff's frequent absences and tardiness,

but discounted this evidence, reasoning that the fact "[t]hat claimant has not been

terminated from her employment suggests her absences and tardiness are not a significant

factor in her continued employment," (R. 23), and "that part of her issues with tardiness

are due to difficulties with transportation," (R. 31.)

Plaintiff criticizes the ALJ's failure to give weight to Beukema's opinions in this

area, but the Court finds the ALJ adequately explained her decision in that regard.  An

ALJ must generally explain the reasons for the weight assigned a medical opinion from

non-acceptable medical source[7], and should consider factors such as the source's

examining and treating relationship with the claimant, how much evidence the source

supplied to support her opinion, how consistent the opinion is with the record as a whole,

the source's medical specialization, and other factors.  20 C.F.R. § 416.927(c)(1)–(6),

(f)(1).  The ALJ explained that Beukema's check-the-box opinions were not supported by

objective evidence, were inconsistent with the benign mental status exams, and overly

relied on Plaintiff's self-reported symptoms, which the ALJ found not entirely reliable.

---

[7] An acceptable medical source is a technical term covering a list of specific types of
healthcare providers.  20 C.F.R. § 416.902(a).  As an APRN, Beukema is not an
acceptable medical source.

The Eighth Circuit has often observed that conclusory opinions by providers set forth in check-the-box form are entitled to little weight unless the conclusions are supported by explanations tied to objective evidence or are consistent with the provider's treatment records. *E.g.*, *Cline v. Colvin*, 771 F.3d 1098, 1104 (8th Cir. 2014). While the Court has concerns about the ALJ's reliance on Plaintiff's self-reported daily activities, as explained in the above discussion about the ALJ's paragraph B conclusions, the ALJ provided other good reasons why she gave little weight to Beukema's conclusory opinions, including the opinion that Plaintiff would be absent from work three or more times per month.

The Court is somewhat more troubled by the ALJ's treatment of Plaintiff's absences as reported in the work questionnaire. The ALJ's rather cavalier rationale that Plaintiff's history of absences and tardiness from her current part-time job could be disregarded since Plaintiff had not yet been fired strikes the Court as a logical non-sequitur. The fact that her current employer (in a job that even the ALJ concluded Plaintiff did not have the RFC to perform) had chosen to forgive her absenteeism is irrelevant to whether employers generally would forgive those absences, particularly in view of the vocational expert's testimony that employers would not tolerate absences more than once a month.

The ALJ also attributed some of Plaintiff's absences "to difficulties with transportation, which is not a factor which can be considered in this analysis." (R. 31.) Although some of Plaintiff's tardiness to work may have been due to transportation issues, that does not explain away her record of other absences and missed appointments

attributed to her struggles with memory and cognition, depression, and anxiety.  (R. 597, 661, 707 789, 790, 793, 801, 843, 847, 862–864, 1060, 1062, 1065.)  Plaintiff testified to episodes during which she isolates for two days at least once a month due to anger, frustration, and lack of motivation, during which she missed work.  (R. 68.)  Furthermore, the records cited above attribute Plaintiff's issues with transportation at least in part to her symptoms.  *Cf. Pate-Fires v. Astrue*, 564 F.3d 935, 945–46 (8th Cir. 2009) (reversing in part because the ALJ found plaintiff's failure to follow prescribed treatment to be evidence undermining her alleged symptoms, but failed to consider evidence that the plaintiff's symptoms drove her non-compliance.)  The ALJ does not appear to have considered this possibility before discarding the evidence of plaintiff's absenteeism.

That said, as the ALJ noted, Plaintiff's record in a job that she did not have the RFC to perform may not be particularly relevant to Plaintiff's ability to perform—and show up for—a job within her RFC.  It is the Plaintiff's burden to demonstrate that any particular limitation should be included in the RFC.  And while Beukema generally opined that Plaintiff's absences were due to her symptoms, neither Beukema nor anyone else offered an objective basis for opining that Plaintiff's symptoms would cause her to be absent more than once a month from a job that—in contrast to Plaintiff's current part-time job as a fast-food worker—would involve only low stress work with simple instructions and decisions and no production-paced work, consistent with the ALJ's determination of her RFC. (R. 21.)

Accordingly, the Court finds that substantial evidence of record supports the ALJ's determination of Plaintiff's RFC, including the decision not to include absenteeism

as a limitation.

## RECOMMENDATION

The Court respectfully recommends that:

1. Plaintiff's Motion for Summary Judgment [ECF No. 25] be **GRANTED**;

2. Defendant's Motion for Summary Judgment [ECF No. 27] be **DENIED**;

3. The final decision of the Commissioner of Social Security be **REVERSED** and the case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with the directive to consider and resolve the conflicting evidence as to Plaintiff's ability to accomplish activities of daily living; to reconsider and explain the weight given the medical provider opinions to the extent they were discounted based on the evidence of Plaintiff's activities of daily living; and in light thereof to reassess whether Plaintiff satisfies the criteria of paragraph B and/or C for any of the listed impairments; and that

4. **JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 1, 2022                    *s/ Hildy Bowbeer*
                                           HILDY BOWBEER
                                           United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).